THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, PROSECUTOR, v. BOARD OF PUBLIC UTILITIES COMMISSIONERS.

Argued June 4, 1913—Decided November 2. 1913.

1. The reserved right of the legislature to alter the charters of corporations, whether such right be reserved in such charters or derived from general laws, is the continuing right of the legislature to regulate in the interests of the public the corporations of this state, and as such does not justify the imposition upon a corporation of an alien duty not regulative in its character or subservient of any public interest.

2. The fortieth section of the General Railroad law, as amended by chapter 129 of the laws of 1911, provided *inter alia* that the members of the State Water Supply Commission should pass and repass free of charge over all the railroads operated in this state. The Delaware, Lackawanna and Western Railroad Company operating a railroad in this state, demanded and received a fare of one Hoagland, a passenger on its train and a member of said commission. Upon the complaint of Hoagland to the Board of Public Utilities Commissioners that body made an order directing *inter alia* the railroad company to carry the members of such commission free of charge, which order was removed to this court by *certiorari*. *Held*, that the order of the Board of Public

Utilities Commissioners in the respect indicated was erroneous and that the duty sought to be imposed by the act in question upon the railroad company to carry free of charge the members of the State Water Supply Commission was not an exercise of the reserved right of the legislature or of the police power, but constituted a taking of the property of the prosecutor without due process of law.

On *certiorari.*

Before Justices GARRISON, TRENCHARD and MINTURN.

For the prosecutor, *Frederic B. Scott, Walter J. Larrabee* and *J. L. Seager* (of the New York bar).

For the Board of Public Utilities Commissioners, *Frank H. Sommer.*

The opinion of the court was delivered by

GARRISON, J. This writ of *certiorari* brings up an order made on February 25th, 1913, by the Board of Public Utilities Commissioners in a matter entitled "In the matter of the complaint of Mahlon L. Hoagland *v.* Delaware, Lackawanna and Western Railroad Co., refusal to allow free transportation."

Mahlon L. Hoagland is a member of the New Jersey State Water Supply Commission who, on the 21st day of January, 1913, while riding as a passenger on the train of the prosecutor tendered, in lieu of a fare, a certificate in card form that had been issued to him by the secretary of state, which certified that in accordance with the provisions of the laws of 1912 Mahlon Hoagland, a member of the State Water Supply Commission, was entitled to pass and repass without payment of fare over any and all railroads in the State of New Jersey. The conductor to whom this certificate was tendered exhibited to the passenger a printed slip issued in general form by the railroad company, notifying him that the company was advised by its counsel that he was not entitled to ride free on its lines and requesting him to pay a proper fare, which he accordingly did, and thereafter on January 29th lodged with

the Board of Public Utilities Commissioners the complaint in which the order brought up by this writ is entitled, in which the said Hoagland complained that he had been required to pay a fare to the railroad company.

Upon the receipt of this complaint the Board of Public Utilities Commissioners' enclosed a copy of it to the railroad company and notified it that Hoagland's complaint would be promptly considered by the board. On February 11th a hearing of said complaint was had by the board, at which the said Hoagland was examined under oath in the presence of and subject to cross-examination by counsel for the railroad company. No other witness was sworn and no other complaint was considered. Certain exhibits were marked, and in a stipulation between the board and the company the various charters under which the latter operated were set forth. After the hearing of Hoagland's complaint an order therein was made directing the railroad company to allow upwards of four hundred persons designated by their official titles to pass and repass free of charge over its road. In this enumeration and in its mandate the order followed the language of section 40 of the General Railroad act as amended in 1911, and was therefore a direction to the railroad company to obey that statute. It is difficult to perceive what force can be attributed to the order of the board that was not previously possessed by the act of the legislature; moreover, the order not only includes many officials who had not complained to the board and whose right to free transportation had not been challenged by the railroad company, but also a large number whose right in this respect was expressly conceded, and yet others whose rights, resting upon variant grounds, have not been heard.

Obviously, the order brought up by the prosecutor cannot in any event be set aside *in toto* excepting upon the most formal and technical grounds, and yet it is equally obvious that if such order, because of its form, is immune from attack the prosecutor is remediless as to the order that was made against it on the merits of the actual controversy: These merits we have decided to consider without regard

either to the technical difficulties presented by the form of the order or to the question whether such order infringed upon the prerogative of this court, a question that has not been argued.

To this end we shall treat the order of the board as decisive of the question it had before it on the complaint of Hoagland, viz., his right as a member of the state water supply commission to free transportation under the statute in question. The question thus to be considered is therefore precisely the same that would be presented if Hoagland, instead of complaining to the utilities board, had applied to this court for its prerogative writ of *mandamus.* In such case the sole question would be whether or not the provision of the General Railroad act that members of the state water supply commission should pass and repass over the railroads of this state was a valid act of legislation as applied to the prosecutor of this writ. This is the question that was presented to the board of public utilities by the complaint of Hoagland, and of which that board took jurisdiction and which by its order it decided against the prosecutor, and this is the question with which we propose to deal upon the *certiorari* bringing up such order.

The precise question may be still further defined by a reference to the special and general legislation exhibited in the case. The former consists of the charters of the constituent lines operated by the prosecutor. These charters, granted at various dates from 1835 to 1875, each provided that certain heads of state departments, not the same, however, in all the charters, should be carried free of charge. The general legislation consists of the General Railroad act and its revisions and amendments.

The first General Railroad act passed April 2d, 1873, provided that certain state officials should be carried free of charge while traveling in the discharge of their official duties. This provision affected twenty-eight persons and applied only to railroads incorporated under that act. The revision of 1903 substantially re-enacted this provision with the addition of the legislative department. In 1907 the provision was

radically altered in three important particulars: *first,* by the addition of a number of officials not heads of state· departments; *second,* by eliminating the qualification as to' traveling on official duty, and *third,* by making the provision apply to all railroads operated in the state.

By amendments passed in 1908, 1909, 1910 and 1911 the act was successively made to include state officers, placeholders and employes to the number of more than four hundred which included the "members of the state water supply commission," with whom alone we are specifically concerned.

In 1912 the act was supplemented by the requirement respecting the issuance by the secretary of state of the certificate in card form of which mention has been made.

The railroad company contends that it is bound by none of these provisions of the General Railroad law but only by those contained in its special charters; the board of public utilities contends that all of this general legislation is binding upon the railroad company as an exercise of the reserved right of the legislature contained either in the special charters of the constituent lines or in the General Corporation ·act.

We are not able to agree wholly with either of· these contentions as to the effect of the General Railroad act as amended in 1907 and subsequent amendments, which is the real ground of contention, since all agree that the prosecutor is bound by the provisions of its special charters and that prior to 1907 the provision in question applied only to railroad companies incorporated under the General Railroad act.    We are unable to agree with counsel for the railroad that the company is bound only by its special charters and is not affected by any subsequent legislation; on the contrary, upon this point we agree with the counsel for the board to this extent, viz., that the railroad company is affected by such subsequent legislation as was properly enacted under the reserved right of the legislature, the point of cleavage being as to what laws may properly be enacted under such reserved right.

This suggestion of a limit to the exercise of such reserved right implies and is intended to imply that such right is neither so narrow nor so broad as counsel have respectively

contended, *i. e.,* that it is not so narrow as to preclude substantial regulation of the right previously granted if required for the public good, and that it is not so broad as to justify the arbitrary imposition for alien purposes of provisions not regulative in character and for the public good that conflict with or substantially impair such right. For obvious reasons the alteration of the corporate rights of stockholders *inter sese* is not dealt with in this opinion.

In cases of the repeal or suspension of charters the public good is the sole criterion, but in cases of their alteration, with which alone we have to deal, an added requirement is that such alteration shall bear such relation to the original charter as to be in effect regulative of the rights and duties thereby conferred or imposed.

Broadly speaking therefore the reserved right may be said to be the continuing right of the legislature to regulate in the interests of the public the corporations created under its laws, and the essential factors of such reserved right, drawn from the nature of the parties thereto, are—*first,* its regulative character which is derived from the already existing grant, and *second,* its promotion of the public welfare which is derived from the presumed purpose of all legislative action.

So that a rough test of any alteration enacted under the supposed sanction of the reserved right of the legislature would be: Is it a regulation for the public welfare of those rights and duties with which the corporation has been invested? If the enactment does not in some sense or in some sort subserve these purposes it is not an exercise of the reserved right of the legislature, which is the sole ground (with one exception to be referred to later) relied upon by counsel for the board in the elaborate brief handed in by him.

If, now, we apply this test to the matter immediately in hand, viz., the requirement that the prosecutor shall carry free of charge the members of the State Water Supply Commission, whether traveling on official duties or for pleasure, recreation or upon private business, it will be seen at once that such requirement lacks both of these essential elements of an exercise of the reserved right. So that if such require-

ment were an isolated instance of such legislation, it is not perceived what argument could be advanced to justify it as a constitutional exercise of the reserved right in the face of the indubitable fact that it takes the property of one person, who happens to be an artificial person, and gives it to other persons, who happen to be official persons.    An exercise of the reserved right to be legitimately such must be rested upon different grounds from these and be designed to accomplish different results.

But it is said that this is not an isolated instance and that the special charters that were accepted by the prosecutor's companies contained a similar requirement as to certain state officials, and that therefore the number of such officials may by subsequent legislation be extended indefinitely.    Such argument is palpably a *non sequitur*, since such charter requirements stand wholly upon the fact of their acceptance by the railroad company affected by them, a circumstance that is conspicuously lacking in the case of subsequent general legislation.

The argument, however, is pressed with such evident good faith that it is deserving of a fuller answer based upon the inception of the legislation in question and its history from 1849 down to 1907.    During this period and more especially during the earlier part of it and the period immediately preceding it, it was, as matter of common knowledge, the prevalent and well nigh universal custom for railroad companies to present free or "complimentary" passes (as they were called) to officials generally throughout the state.    It is not necessary to charge that any corrupt motive inspired these gratuities, or to intimate that in case of their acceptance any actual harm to the public resulted therefrom; the harm was in the impression made upon the public mind, which, not unnaturally, viewed with apprehension and dissatisfaction a practice by which those in charge of its government were placed under obligations, or even under a suspicion of obligation, to corporations whose affairs in their relation to the public were so constantly calling for official action.    The extent to which during this period this jealousy of railroad influence was a

public and, at times, a political issue, is to be recognized like any other fact of political history, and when so recognized accounts for the course of legislation with which we are concerned and furnishes the basis of the legislative policy evinced thereby.

Sister states dealt variously with this problem, for it was a far-reaching evil, and in many of them the tender, or the acceptance by officials, of such gratuities was prohibited by law, constitutional or statutory. In New Jersey we dealt with it differently and the gratuity, instead of being prohibited in whole or in part, was entirely eliminated by making the free transportation of certain governmental officers obligatory upon the railroads, a duty into the performance of which no element of gratuity could possibly enter. Whether this was a wise policy, and whether the class around whom this protection was thrown was wisely selected, are purely legislative questions with which we have no concern. What does concern us is that such regulation was enacted in the pursuit of a legislative policy based not only upon a state of facts of which the legislature had the right to take notice, but also upon a line of conduct that had already been entered upon by the railroad companies, which, being found to be inimical to the public interest, was a proper subject for regulation in the interest of the public.

Such legislation therefore presented every element of the exercise of the reserved right and also of the police power, and in this connection it is well to bear in mind what was said by this court in the case of *Hopper* v. *Slack,* 40 *Vroom* 562: "Every exercise of the police power involves, of necessity, the determination by the lawmaker of some fact quite apart from the exercise of any legislative discretion concerning it * * * This distinction is vital since it marks the distance that separates an act passed for the *regulation of conduct upon which citizens have already embarked* from the creation by the legislature of institutions that compel citizens to a course of conduct upon which they had not voluntarily entered."

The legislature was therefore clearly within its rights in dealing with this problem as one of public concern and in

the course of legislation by which its chosen policy in this regard was evinced and effectuated. Commencing in 1849, at a time when special charters were granted to railroad companies, down to 1907, *i. e.,* during a period of nearly sixty years, the legislative treatment of this subject, whether by special or by general laws, was consistent only with the policy indicated. The fact that during this long period not a single step was taken outside the line of such policy is the strongest possible identification of its limits, for the temptations to overstep such limits were doubtlessly as strong then as now. The two changes that were made during this period, viz., the addition of the legislature itself and of the Vice Chancellors when they were appointed, serve to emphasize an adherence to such policy rather than to indicate a departure from it. Hence, when such provision was by the amendment of 1907 made applicable to all railroads operated in this state, the legislature was well within its reserved right so far as its long continued policy was concerned; but when in that and subsequent years the provision was made to apply to persons to whom such policy had no possible application, it departed from the exercise of its reserved right to regulate railroads for the public good and provided in effect for the taking of the property of such corporations without due process of law. For the right of a railroad company to receive pay for the transportation of passengers is its property, as much as gas, or water, or electricity is the property of corporations authorized to deal in those commodities.

Once eliminate the element of public policy as the legal justification of the railroad provision in question and nothing is left but the bare fact that the subjects of free transportation are public officials, and I know of no principle of law or rule of property that will justify the taking of the property of any one of these public service corporations, or for that matter of any corporation, and handing it over to public office-holders merely because they are the holders of public office. Something more is required to turn such a taking into a regulation for the public good, something that smacks of public policy or the police power.

It is one thing, for instance, to say to the railroad companies, "For reasons of public policy you must carry free of charge the members of the legislature by whom the laws affecting you and your interests are made," and quite a different thing to say to such companies, "You must carry free of charge the members of the state water supply commission, whose activities in nowise affect you or your affairs." *4 Comp. Stat., p.* 5792.

The first is an exercise of both the police power and the reserved right, the second takes the property of the stockholders without due process of law.

It is not a question of the interpretation of the constitution which may be primarily for the legislature (*Attorney-General* v. *McGuinness,* 49 *Vroom* 346), but one of statutory construction which is always a judicial function.

If the line be not drawn at the point justified by the public policy in question I do not see where it can by any principle of law be drawn short of actual confiscation; where indeed it is suggested that it should be drawn by the argument that "There is nothing in the record to show that compliance with the act of 1911 will seriously impair the revenues of the prosecutor; nor to show that such compliance will prevent it from earning a fair return upon the fair value of its property devoted to the public use." It is perhaps needless to add that this rule derived from the rate making cases has no application whatsoever to donations by the legislature of free transportation.

The volume of case law bearing upon the general topic of the reserved right but having no specific pertinence to the question in hand is enormous; but it is safe to say that if there were any case directly in point it would have been cited to us. Cases involving reduced rates for the transportation of troops or for the school tickets of children attending the public schools or other similar matters in which the public has a direct or an indirect interest do not touch the point. More nearly in point is the case of *Charlotte, &c., Railroad Co.* v. *Gibbes,* 142 *U. S.* 386, cited by counsel for the board, in which a statute authorizing the assessment of a

tax upon railroad companies to meet the salaries of the state railroad commissioners was upheld upon grounds that apply to some of the officials included in the present order but not for the reasons already given, to the members of the particular state commission with whom alone we are specifically concerned. On the other hand, the case of *Wilson* v. *United Traction Co.,* 72 *App. Div.* (*N. Y.*) 233, which involved the free transportation of policemen and firemen, is directly to the contrary. This case was referred to without comment by Mr. Justice Swayze in *State* v. *Sutton,* 54 *Vroom* 46, in which a statute requiring street railways to grant free transportation to uniformed police officers was sustained upon three assumptions of fact, to each of which the principles of police law properly applied.

It is believed that apart from the police power or some principle of public policy no court has decided that legislative donations of free transportation are within its reserved right, and if such a decision were found it is difficult to conceive by what principle of law it would be justified.

The notion that such a taking of property may be justified as a revenue raising measure intended to eke out the salaries of state officials, although touched upon in the brief for the railroad company, is not alluded to in the brief of counsel for the board, hence it need not be considered and may be dismissed with the comment that such argument would run counter to pretty much everything that has been decided touching taxing acts both as to their titles and substance; as matter of fact most if not all of the officials affected by this legislation at its inception were paid in whole or in part by fees, *i. e.,* an indeterminate sum and not a stated salary. Moreover a law that levied upon railroad companies a tax equal to the price of a fare for every ride a certain person chose to take would make the amount of such tax dependent wholly upon the will of such person, a thing unheard of in the law of taxation. The point, however, for obvious reasons is not made by counsel for the board.

The remaining point that is made in support of the order is that in 1873 the charter of one of the constituent roads

was amended to permit the construction of a short branch (*Pamph. L.* 1873, *p.* 1348), and that the lease of another road was taken by the prosecutor under the authority of the General Railroad act. Upon these facts the sole comment made in the brief of counsel for the board is "The prosecutor is, therefore, not in a position to contend that the act of 1873, as revised in 1903 and amended by the act of 1911 is, as to it, unconstitutional." If the intended argument is that the prosecutor by reason of the premises is debarred from questioning the force or application to it of any of the other provisions of the General Railroad act it is clearly unsound.

By force of such a doctrine a party who had filed his complaint or amended his answer under the authority of the Practice act would be debarred from questioning the validity of anything contained in that statute. There is no such rule of law. It is conceded that by incorporating under a general act the provisions of that act are accepted, but beyond this the argument cannot be pressed without resulting in palpable injustice and absurdity.

Finding no legal justification for the provision of the General Railroad act as amended in 1911, by which the prosecutor was required to allow members of the State Water Supply Commission to pass and repass over its road free of charge during their respective terms of office, our conclusion is that the decision of the Board of Public Utilities Commissioners to that effect was erroneous, and that so much of the order of that board as directs the prosecutor to allow the members of that commission to pass and repass free of charge over its road should be set aside.

This disposes of the question with which we announced the intention to deal, in the discussion of which we have avoided, as far as was possible, expressing any opinion that might prejudice the rights of other officials who, although named in the order under review, were not parties to the proceeding in which it was made and have not had their day in court.